IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SHANTE M. KILPATRICK,          )
                               )
          Plaintiff,           )
                               )
     v.                        )   Case No.
                               )   10-0566-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,            )
                               )
          Defendant.           )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Shante Kilpatrick seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title XVI
of the Social Security Act ("the Act"). Plaintiff argues that
the ALJ erred in determining plaintiff's credibility and residual
functional capacity and in relying on the testimony of the
vocational expert. I find that the substantial evidence in the
record as a whole supports the ALJ's finding that plaintiff is
not disabled. Therefore, plaintiff's motion for summary judgment
will be denied and the decision of the Commissioner will be
affirmed.

## I.   BACKGROUND

On January 4, 2006, plaintiff applied for disability
benefits alleging that she had been disabled since June 2, 1986
(her fourth birthday). Plaintiff's disability stems from mild
cerebral palsy, borderline mental retardation, and concentration

difficulties. Plaintiff's application was denied initially. On August 6, 2008, a hearing was held before an Administrative Law Judge. On September 5, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 6, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply

2

a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that

Case 4:10-cv-00566-REL   Document 15   Filed 11/02/11   Page 3 of 44

the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857
(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo.
2000).

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to
determine whether a claimant is disabled.  These regulations are
codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step
sequential evaluation process used by the Commissioner is
outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful
activity?

    Yes = not disabled.
    No = go to next step.

2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits her ability
to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment
in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.   Does the impairment prevent the claimant from doing
past relevant work?

    No = not disabled.
    Yes =  go to next step where burden shifts to Com-
missioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Denise Wydell, in addition to documentary evidence admitted at the hearing.

### A.    *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned the following income from 2001 through 2006:

| Earnings | Year |
|----------|------|
| $   560.01 | 2001 |
| $   682.05 | 2002 |
| $2,298.63 | 2003 |
| $1,282.97 | 2004 |
| $1,926.33 | 2005 |
| $   954.63 | 2006 |

(Tr. at 69).

### Disability Report - Field Office

On January 5, 2006, plaintiff met face to face with V. Anthony in regard to her application for benefits (Tr. at 73-76).

V. Anthony observed that plaintiff had no difficulty hearing, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands or writing (Tr. at 75). Plaintiff was described as a very nice person and no problems with her appearance (Tr. at 75).

**Function Report - Adult**

In a Function Report dated January 28, 2006, plaintiff reported that she can clean, do laundry, iron, and mow for 30 minutes to an hour at a time (Tr. at 103). She prepares her own meals, goes out every day to visit friends, goes to the library, is able to walk and use public transportation, can go out alone, does her own shopping, can pay bills and count change, has no problems getting along with people except that she has arguments with people when she does not agree with what they say (Tr. at 101-108). She reported that she has no difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, memory, completing tasks, understanding, using her hands, or getting along with others (Tr. at 106). Plaintiff can walk several miles at a time without needing to stop and rest (Tr. at 106). She can follow spoken instructions "very well [with] no problems" (Tr. at 106). She can follow written instructions "very well but sometimes I have difficulty" (Tr. at 106). She has no problems

getting along with authority figures (Tr. at 107).  She has gotten fired from a job because of problems getting along with other people because she did not agree with what they were telling her (Tr. at 107).

**Function Report Adult - Third Party**

Plaintiff's mother filled out a Function Report essentially corroborating plaintiff's Function Report (Tr. at 109-115).  She indicated that plaintiff has no trouble with personal care, prepares her own meals, goes out almost every day, can walk or use public transportation when she goes out, can go out alone, can do her own shopping whenever she needs to and for however long she needs to, socializes with others, does not need to be reminded to go places, and has problems getting along with others if she is not given her own way.  Her disability stems from cerebral palsy and attention deficit disorder.  Plaintiff's mother indicated that plaintiff was fired from a job because of "racial problems."

**B.    *SUMMARY OF MEDICAL RECORDS***

In a Mental Residual Functional Capacity Assessment dated February 24, 2005, Keith Allen, Ph.D., found that plaintiff is not significantly limited in any ability other than her ability to understand and remember detailed instructions; to carry out detailed instructions; to interact appropriately with the general

7

public; and to respond appropriately to changes in the work setting (Tr. at 219-221). Those four abilities were listed as "moderately limited" (Tr. at 219-220).

In support of his findings, Dr. Allen wrote the following:

Cl[aimant] is a 23 year-old-female with complaints of ADD [attention deficit disorder] and CP [cerebral palsy]. AOD [alleged onset date] 6/2/86. Reported she stopped working 12/31/05 because "They won't give me enough hours". She does not report currently seeking/receiving mental health treatment. DO [disability office] noted cl[aimant] had no problems with understanding, coherency, concentrating, or talking, very nice person. Borderline intellectual functioning is indicated and reports having been diagnosis [sic] with ADHD [attention deficit hyperactivity disorder] in the past, generally consistent with CE [consultative exam] presentation. School records indicate a history of learning difficulties but being mainstreamed in all regular 9th and 10th grade classes, having difficulties in large group activities, demanding teacher's 1:1 attention, wanting to do well and trying on most assignments, could lose her temper easily, but once she began an assignment she was conscientious. Cl[aimant] reports being able to self care, prepares "five course meals" daily, performs routine household chores w/o reminders, gets out of the home "on a daily basis, can use public transportation, shops and goes to the library, is able to manage her own funds, reports no problems with attention/concentration/memory/understanding with reading or watching TV which she reports she does "very well and often", visits with friends, does not need to be reminded to go places, and reports being able to follow written and spoken instructions "very well" (states "sometimes I have difficulty" with written instructions), and reports being able to get along with authority figures "very well, no problem".

(Tr. at 221).

On February 11, 2006, plaintiff was seen by Michael Schwartz, Ph.D., after having been referred by DDS (Tr. at 223-225). The report reads in part as follows:

8

Chief Complaint

She indicates her disability is mild cerebral palsy and mild
mental retardation.  She has problems with her fine motor
skills, particularly her right hand.

* * * * *

History of Present Illness

. . .  She denies drug and alcohol problems.  She states she
has had four inpatient psychiatric stays as a teenager
because she was rebellious.  She did see a counselor in the
past.  In the past, she states she has been on Ritalin and
Celexa.  She states they helped her concentrating. . . .

The claimant gives a history of being raised by her mother
and grandmother.  She was in the DFS system from ages 10 to
14 years old in foster care.  She has two children.  One
child, two years old, was taken by the state.  Another child
lives with the claimant's father, that is the child's
grandfather.

In regards to her current functioning, she states, "I'd
rather be doing better."  When asked in what way, she states
she would like to be stable and have her own residence.  She
indicates in the past she had a "total nervous breakdown."
She states that when this happens "I want to be alone.  I'm
not talkative to anybody.  I close up and I have a lot of
built up anger.  It's been built up from childhood."  When
asked how she is functioning overall, she states, "I'm not
stable in life.  I don't know why I am."  She indicates she
is close to her mother and her daughter.  However, she never
gets to see them.  What keeps her going is the thought of
her children.  "I don't see my son at all.  I see my
daughter once a year when my dad chooses to let me see her."
Her goal in life is to get her daughter back and raise her
like a mother-daughter are supposed to be.

. . .  Her longest job was for six months at the same
Wendy's at a prior period of time.  At that time, she worked
18 hours a week.  She left that job to move to Arkansas.

9

<u>Mental Status</u>

. . . She states the main reason she cannot work is lack of concentration. . . .

<u>Summary and Conclusion</u>

. . . She appears to be functioning at the rather high end of the borderline retarded range of intelligence. Her sister-in-law states she has ADHD and the claimant indicates she has been on Ritalin in the past. Her presentation is consistent with this. She did jump around in her conversation. She appears to be quite impressionistic and reactive.

<u>Potential of Competitive Employment</u>

I believe she could remember work location and procedures and understand and follow simple directions. However, I believe it would be difficult for her to maintain these behaviors on the job over time. She appears to be emotionally reactive to others and does not appear to be doing a very good job of taking care of herself in terms of her personal appearance and also indicated by the fact that she has lost custody of both of her children.

<u>Diagnostic Impression</u>

Axis I:    Attention deficit hyperactivity disorder,
           provisional
Axis II:   Borderline mental retardation by history
Axis III:  Cerebral palsy, by history
Axis IV:   Psycho-social stressors:  separation from children
Axis V:    GAF = 50[1] current
           GAF = 50 highest level in past year

(Tr. at 223-225).

_____

[1]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Case 4:10-cv-00566-REL   Document 15   Filed 11/02/11   Page 10 of 44

On February 24, 2006, Keith Allen, Ph.D., completed a Psychiatric Review Technique (Tr. at 227-238). Dr. Allen found that plaintiff has mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and insufficient evidence of episodes of decompensation (Tr. at 237).

On March 27, 2006, plaintiff saw Norman McCarthy, D.O., at the request of Disability Determinations (Tr. at 241-244). Dr. McCarthy's report reads in part as follows:

> **HISTORY OF PRESENT COMPLAINT:** The examinee is a 23-year-old Caucasian female who states she was last employed by Wendy's in 2005 as a cook at two different times and states prior to that she was employed by Motel 6 as a housekeeper. Examinee states she is not able to work because she has CP on right side. She states this tends to interfere with her fine motor skills with regard to the right hand. She further states she has some mental retardation. Examinee is very vague and unclear as to how these really interfere with her performing any kind of job duties. Examinee did not mention any other complaints with regard to her performing any kind of physical activities.
>
> * * * * *
>
> **REVIEW OF SYMPTOMS:** . . . Psychological - Depression and anxiety times five years on no therapy. . . .
>
> **PAST MEDICAL HISTORY:** Examinee states that she saw a physician in regard to an evaluation for CP (cerebral palsy) in 1992. In 2000 she saw a physician for a pregnancy. She saw a physician in regard to pneumonia in 2002. In 2003, she saw a physician in regard to pregnancy. Also in 2003, she saw a psychologist for evaluation. Examinee did not mention any other physician visits.

11

**REVIEW OF MEDICAL RECORDS:**  Examinee had medical records which were reviewed and reveal that in February 2006, she was seen by a psychologist [for a consultative exam] at which time she was felt to be a borderline retardation and functioning on a rather high end of the borderline.  It was also felt that the individual could remember work locations and procedures and understand and follow simple directions. This record indicates no such diagnosis of cerebral palsy. No other pertinent information with regard to allegations were obtained from these available records.

\* \* \* \* \*

**SOCIAL HISTORY:**  Examinee states she smokes one pack a day and has done so for six years.  Alcohol use was denied. Drug use was denied.

**MEDICATIONS:**  Examinee states she is taking no medications.

Dr. McCarthy performed a physical exam and found, among other things, that plaintiff had normal range of motion in her shoulders, elbows, wrists, hips, knees and ankles.  She had normal strength in her upper and lower extremities.  She had normal grip strength, could make a fist and fully extend her hands, and her fingers could be opposed bilaterally (Tr. at 243).

**DIAGNOSTIC IMPRESSIONS**

1. Mental retardation (alleged) and has documentation stating borderline.
2. Cerebral palsy (alleged and not documented).
3. Chronic tobacco abuse.

**PHYSICAL FUNCTIONAL CAPACITY**
The following recommendation is based on medical judgment and the information available to me at this time.  It reflects the examinee's ability to perform work related functions on a day-to-day basis.  It must be medically noted, that during this exam, there were no findings suggestive of any kind of cerebral palsy or residual if present and there were no losses of ranges of motion and,

therefore, there was really no evidence of any functional
restriction or physical impairments.

It must be further noted that the examinee was a pleasant,
well-proportioned, cleanly dressed female in no distress.
She was alert, oriented to person, place, time and purpose.
Her speech was rapid and clear and understandable.  Her
thought processes were logical.  She had good eye contact.
Her memory and mentation were intact.  Her mood was normal
with normal range of affect.

On October 1, 2007, plaintiff presented to Truman Medical

Center Behavioral Health and reported symptoms of depressed mood,

poor concentration, isolation, low motivation, mood swings,

occasional crying spells "every once in a while", and poor sleep

(Tr. at 321-330).  Plaintiff's past mental health treatment

consisted of medication in 2003 for postpartum depression.  She

was not on any medication or receiving any treatment at this

time.  Plaintiff's "physical health screening" showed that

everything was normal (Tr. at 324).  Daily exercise was

encouraged (Tr. at 325).

Plaintiff reported that she has no source of income, that

she is supported by her boy friend and through food stamps (Tr.

at 26).  She reported that she quit her last job nine months ago

"to obtain her GED and find a career" (Tr. at 326).

Plaintiff reported that she had no history of verbal/

emotional abuse (Tr. at 327).  She described her mother as

"bipolar out of meds".  She reported an "excellent" relationship

with her seven-year-old daughter who lives with plaintiff's

father (Tr. at 327).

Plaintiff's general appearance was within normal limits except she was noted to have poor oral hygiene (Tr. at 327). Her alertness was within normal limits except the author noted "some concentration difficulty." Her orientation, affect, thought continuity, thought content, abstraction, speech, memory, and behavior were all within normal limits (Tr. at 327). She had increased motor activity and was irritable (Tr. at 327). Her GAF was 55-65[2] (Tr. at 321-30).

On October 16, 2007, plaintiff returned to Truman Medical Center Behavioral Health and underwent an initial psychiatric evaluation (Tr. at 316-320). Plaintiff denied significant feelings of anxiety. Plaintiff reported several hospitalizations between the ages of 10 and 14 due to behavior problems. She also reported "another previous hospitalization about 5 years ago [or late 2005][3] for unclear reasons stating 'I had a nervous

_____

[2]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[3]There are no records of this hospitalization and interestingly, plaintiff never mentioned this hospitalization before or after this date.

14

breakdown.'" Plaintiff said she had not been on any medication for the past four years, but that Remeron, taken in the past, had worked for her and she had had no side effects with that medication (Tr. at 317).

Plaintiff's grooming was observed to be "good" (the choices on the form were good, fair and poor) (Tr. at 318). Her behavior was cooperative, her motor activity was normal, posturing and mannerisms were absent, she was fully alert, fully oriented, her speech was normal, her memory was intact (recent and remote), her affect was appropriate, her mood was euthymic, thought content was normal, thought process was normal, insight was good (Tr. at 318). Her judgment was good and she had no suicidal or homicidal ideation (Tr. at 319). "She is in a stable living environment but is concerned her worsening mood swings will impact her current relationship." (Tr. at 319).

Joshua Elliott, M.D., staff psychiatrist, diagnosed mood disorder not otherwise specified, major depressive disorder versus mood disorder secondary to cerebral palsy, mild mental retardation, economic stressors, and a GAF of 55 (see footnote 2). He prescribed Remeron for depression, recommended supportive psychotherapy, and told her to return in four weeks (Tr. at 320).

Plaintiff returned to Truman Medical Center Behavioral Health on November 28, 2007, and reported her irritability had

Case 4:10-cv-00566-REL   Document 15   Filed 11/02/11   Page 15 of 44

improved but she continued to experience sleep problems (although she was sleeping six to eight hours per night, she felt lethargic during the day) (Tr. at 312-315). Plaintiff denied problems with concentration. "She supports herself financially by giving plasma twice weekly. She obtains food stamps. Currently living with her boyfriend who is unemployed." (Tr. at 313). Plaintiff reported that she had applied for disability but was denied and that she had applied again (Tr. at 313). Her grooming and hygiene were noted to be fair, her behavior was cooperative, her speech was normal, her motor activity was normal, she had no abnormal movements, her mood was euthymic, her affect was appropriate, she was alert and oriented, her attention and concentration were intact, her thought processes were logical and goal directed, she had no delusions or hallucinations, and she presented no danger to herself or others (Tr. at 313-314). Plaintiff indicated that losing custody of her son who is now adopted was contributing to her "affective instability." She expressed again her concern that her mood swings would impact her relationship with her boy friend. The attending physician increased plaintiff's dose of Remeron and prescribed Vistaril (induces sleep).

Plaintiff also started services with Truman Medical Center Employment Services and Vocational Rehabilitation Services on

this date (Tr. at 310-311).  She started group therapy in
December 2007 (Tr. at 304-05).

On December 3, 2007, plaintiff was seen at Truman Medical
Center and reported that her irritability and violent outbursts
had been responding to Remeron (Tr. at 315).

On December 19, 2007, plaintiff participated in group
therapy (Tr. at 304-305).  She engaged well with other group
members (Tr. at 304).  Plaintiff arrived on time, she was well
groomed with clean clothing, and she exhibited no behavior
problems (Tr. at 304).

On February 13, 2008, plaintiff participated in group
therapy (Tr. at 302).  She arrived promptly, exhibited no
behavior problems, her mood and affect were stable, she was well
groomed with clean clothing, and she actively participated in the
group process without difficulty (Tr. at 302).

On February 20, 2008, plaintiff presented to Truman Medical
Center Behavioral Health for medication management (Tr. at 292-
296).  She reported her irritability and anger problems were
being effectively controlled with her medication.  "No problems
with irritability/agitation or anger control at this time.  Being
effectively controlled with meds.  Client has been compliant with
her medications and reports an improvement with her sleep, and
stress and anxiety level has subsided to a minimal level at this

17

time." Plaintiff's behavior was observed to be cooperative, her speech was normal, motor activity was normal, she had no abnormal movements, her mood was euthymic, her affect was appropriate, she was alert, her attention and concentration were intact, her thought processes were logical and goal directed, she had no delusions or hallucinations, and she was not a danger to herself. Plaintiff continued to smoke a pack of cigarettes per day. She was advised to stop smoking and was continued on her same medications, same dosages.

On March 10, 2008, plaintiff's employee specialist at Truman Medical Center Employment Service completed a Vocational Evaluation Report (Tr. at 299-301). "Despite Ms. Kilpatrick's mild CP she is physically able to work. In the appropriate setting Ms. Kilpatrick was able to remain engaged in completing her job tasks. She was also able [to] complete tasks with modeling and coaching."

The employee specialist described plaintiff's experience at three community based assessment sites. Her first assessment was in a food preparation. She arrived on time and was appropriately dressed and groomed. It was noted that although plaintiff properly performed her job duties, she may have been talking too much to the other workers. She did fine with serving; she was talking too much during cooking. When asked how she felt about

18

this assignment, plaintiff said it was all work she had done in the past so it was not new to her, and she spoke more about the people she was working with than her job duties.

Her second assessment was a janitorial job. Plaintiff arrived on time and was properly dressed. Plaintiff worked alone and was able to do the job efficiently and quickly although "with not much effort or detail." Plaintiff swept two staircases, mopped the staircases, and wiped down sinks and conference room tables -- all efficiently but with little effort. She was then told to dust and wipe down the windows, and she then appeared agitated and complained about having to complete these assessments. She said "she had done all this type of work in the past and what she really wanted was to run her own business." Plaintiff said she was tired of having to follow other people's orders. At the end of the day, plaintiff said she had forgotten how hard janitorial work was and that it made her realize she really needed to go back to school and get her GED (Tr. at 300).

Plaintiff's third assessment was in a factory position. She was ready on time and dressed appropriately. Plaintiff was directed to place a large bowl, a medium bowl, and four small bowls, along with two lids, in each set for packaging. Plaintiff sometimes set up the wrong number of bowls, and at times threw the lids across the table rather than properly walking around to

place them in the appropriate place.

On April 1, 2008, plaintiff met with her occupational therapist ("OT") at Truman Medical Center Behavioral Health for services (Tr. at 285). The OT noted plaintiff required redirection at times to remain on task but was "easily redirectable." Plaintiff appeared motivated to participate in services.

On April 16, 2008, plaintiff met with the staff psychiatrist at Truman Medical Center Behavioral Health (Tr. at 278-281). She reported Vistaril had helped her anxiety, but she continued to have bad days and good days. She was only taking Vistaril every other day. She had fair hygiene and grooming; was pleasant, cooperative and engaging; her attitude was calm and cooperative; movements were normal; speech was normal; thoughts process and content were logical and goal directed; her mood was euthymic; her affect was appropriate and reactive; she was alert and oriented times four; her concentration and attention were intact; she displayed average intelligence; her insight was fair (Tr. at 278-81).

On April 23, 2008, plaintiff presented to Truman Medical Center Behavioral Health to meet with her OT. The OT noted plaintiff seemed slightly pressured in her speech during the session and seemed to have some difficulty attending to task

20

because her aunt was sick and dying (Tr. at 275).

On May 12, 2008, plaintiff presented to her session with her OT with an irritable mood because of an incident on the bus while coming to her appointment (Tr. at 269). Her OT assisted her with making healthy choices while grocery shopping.

On May 29, 2008, plaintiff seemed to have a tangential thought process and required moderate/maximum redirection at times to attend to the topic of discussion (Tr. at 265). "Client identified 10 activities she could participate in when feeling stressed. She required moderate assistance to identify those stress relievers. Client seemed to have difficulty attending to task during the session. She demonstrated some adolescent or childlike behaviors and seemed slightly resistant to feedback. This behavior may have been due to feeling less stressed with her situations at home."

On June 13, 2008, and June 16, 2008, plaintiff was seen by Douglas Vaughan, Ph.D., for a consultative exam (Tr. at 250-255). Dr. Vaughan's report reads in part as follows:

> General Observations:
> This claimant is a 26 year old white female who walked approximately 3 miles from the nearest bus stop to the appointment. She completed her own initial paperwork. . . . She was dressed casually and appropriately, and her grooming and hygiene were marginally adequate. She was cooperative and pleasant. . . . She returned as scheduled on 6/16/08 to complete the Woodcock-Johnson-Revised test, and while she had received a ride to the appointment, she appeared to walk back home.

* * * * *

History of Present Illness:
. . .  She is currently seeing Dr. Sharma at Truman
Behavioral Mental Health Services and is prescribed
Mirtazapine and Hydroxyine PAM.  She has been going to TMCBH
for about two years, and she denies receiving counseling or
case management.  But, she did indicate receiving
occupational therapy from TMCBH to help her deal with her
emotions, not become angry and irritable, and also teach job
skills.  She denies any other recent outpatient psychiatric
treatment.  She had prior psychotherapy or counseling with
Mr. Ken Luther about four years ago to deal with the stress
and anxiety when she was going through her son's case of
releasing her parental rights. . . .

She endorses the following symptoms of depression (when she
does not take her medications):  depressed mood, loss of
motivation, insomnia and hypersomnia, low energy sometimes,
change in weight, feelings of worthlessness and difficulty
concentrating, but she denied loss of pleasure, loss of
appetite, social withdrawal, suicidal thoughts, crying
spells, and feelings of guilt.  She denies any history of
suicide attempts or current suicidal or homicidal ideation.
She rates her depression now as 4-5 on a scale of 10.  She
reports that her medication controls her depression well,
but when she does not take her medication, she has mood
swings, irritability, sleep problems, and loss of appetite.
. . .

Work History:
She last worked in 2007 at Wendy's fast food as a crew
member cleaning the dining room, as a cashier, and preparing
salads.  She did this for about six months.  Her reason for
leaving was quitting because she was not making enough
money, only enough to get to and from work.  She has
previously worked in office clean-up and motel housekeeping,
and she denies other jobs.

Social History:
. . .  She was raised by her mother for the first ten years
of her life, but when a DNA test identified the father, the
mother gave the claimant to the father to raise, i.e., "I've
raised this hyperactive, bipolar, attention-deficit kid for
10 f**king years, why don't you raise her for a while?"  The
mother had collected state child support for 10 years and

22

not identified the father.  She was then turned over to her father and his wife, but they were not able to raise her due to her rebelliousness.  She was then placed in foster facilities until the mother regained custody of her when she was 14 years old. . . .  She denies any history of abuse or trauma, but she noted feeling abandoned by both parents. . . .  She has never been married and has two children, ages 7 and 4.  She is in a current relationship with a male for the past year.

Medical History:
The client reports she is in fair physical health, and she did not indicate any medical/physical problems other than psychiatric issues. . . .

Activities of Daily Living:
She lives in a trailer with her boyfriend, but her daughter lives with the claimant's father and her son was taken away as the claimant "signed away" her parental rights, and the son was adopted away.  The claimant reports no problem with dressing, showering, or self-care.  She is able to perform all household chores and laundry, cook, shop for groceries and clothing, and use the public bus system. . . .  [S]he can use a computer at a library to check e-mail, check out books, and take online surveys.  On a typical day, she will take her medications, having doctor's appointments, have occupational therapy with Truman Behavioral to help her to "gain work skills and deal with my emotions", and "hang out with friends."

* * * * *

Mental Status Exam:
. . .  Her behavior was generally pleasant and cooperative in the interview. . . .  Thought processes were logical and coherent, and thought content was appropriate.  Speech had a sing-song quality at times in relating her history.  She spoke in a loud voice at times and rambled on about her negative history at times. . . .  She laughed at some of the examiner's questions. . . .  She was oriented times four to self, place, time, and other.  Intelligence was judged to be low average, based upon educational history, vocabulary, similarities, abstraction ability, and fund of knowledge.  She was able to provide fairly appropriate meanings for . . . proverbs. . . .  Memory and concentration were adequate for the purposes of the interview.  Long-term memory was

23

intact for recalling her history, place of birth, the name
of her first grade school, and the birth dates of her
children.  Recent memory was intact for recalling three out
of three items, her activities the day before (at Crown
Center with friend's children and had occupational therapy),
and what she ate last evening. . . .  Her attention and
concentration were generally intact for the interview
despite some rambling. . . .

Test Results:

WAIS-III Results:

. . .  Full-Scale IQ 78

The Verbal, Performance, and Full-scale IQs are all in the
Borderline range.  These scores may slightly under-represent
the claimant's intellectual potential, as she appeared to
become somewhat fatigued during this test yawning
occasionally.  Also, her clinical presentation seemed to
suggest slightly higher functioning in the low average range
than the borderline range. . . .  Her presentation and
activities of daily living also suggest somewhat higher
functioning.

. . .  Information was her highest subscore, but she had a
peculiar pattern of responses missing several easy items,
while getting more difficult ones correct.  For example, she
did not know how many weeks there are in a year, the
continent Brazil is on, or who Martin Luther King Jr. was;
yet she knew Michelangelo had painted the Sistine Chapel and
what the Koran was. . . .

Wechsler Memory Scale (WMS-III) Results:

. . .  While the claimant's intellectual scores are in the
Borderline range, it is of note that the majority of her
memory scores are above that range in the low average and
average ranges.  This too suggests that her cognitive
capabilities are somewhat higher than the borderline
intellectual range. . . .

* * * * *

Diagnostic Impressions (DSM-IV):

Axis I    Major Depressive Disorder, recurrent, in partial
          remission with medication (vs. rule-out Bipolar
          Disorder)
          Anxiety Disorder NOS
          Attention-Deficit disorder, predominantly
          inattentive type, provisional (vs. Bipolar
          Disorder)
          Learning Disorder NOS with arithmetic and writing
          deficits
Axis II   Personality Disorder NOS with compulsive features
Axis III  Reported history of mild cerebral palsy
Axis IV   Stressors:  abandonment by parents, loss of
          parental custody
Axis V    Current GAF = 55[4]

Recommendations and Prognosis:
No additional treatment recommendations are recommended at
this time.  It is recommended that medical evidence from Dr.
Sharma at Truman Behavioral Mental Health and Vocational
Rehabilitation be obtained, if not done so already.  While
she is on generic Remeron apparently for mood issues, she
does not report being on medication for ADD issues and may
have improved attention and concentration if she did.

Functional Capability:
This claimant appears capable of understanding and
remembering simple and possibly some repetitive detailed
instructions.  She is able to attend and concentrate for
simple tasks, although she would have difficulty attending
and persisting for more detailed tasks.  She is capable of
interacting socially with the public, supervisors, and
coworkers in a low-stress work setting, although she may
need counseling about her appearance and grooming.  She
reports having friends and related fairly well with the
examiner.  She seems able to adapt to routine work changes
in a low-stress work setting.

---

[4]A global assessment of functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).

Case 4:10-cv-00566-REL   Document 15   Filed 11/02/11   Page 25 of 44

On June 18, 2008, Dr. Vaughan completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) (Tr. at 256-258). He found that plaintiff had a slight impairment in her ability to understand and remember short, simple instructions; carry out short, simple instructions; and interact appropriately with supervisors. He found that she had a moderate impairment in her ability to understand, remember and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public and coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting.

## C.    *SUMMARY OF TESTIMONY*

During the August 6, 2008, hearing, plaintiff testified; and Denise Waddell, a vocational expert, testified at the request of the ALJ.

## 1.    **Plaintiff's testimony.**

Plaintiff was 26 years of age at the time of the hearing and is currently 29 (Tr. at 21, 58). She went six weeks into twelfth grade before dropping out of school, and she never got a GED (Tr. at 21). She dropped out of school due to the birth of her daughter (Tr. at 21). At the time of the hearing, plaintiff was in the process of going through a training program to become an entry level kitchen helper (Tr. at 21). Plaintiff was learning

26

to cook, how to prepare entrees, cater, wash dishes, and make desserts (Tr. at 22).

Plaintiff previously worked at Wendy's and for Midwest Cleaning, which is an office cleaning company (Tr. at 23). She worked at Wendy's off and on for about a year (Tr. at 23). She did "just about everything" at that job (Tr. at 23). She left because it was a stressful environment and she "was not bringing in enough income" to support herself and pay her bills (Tr. at 23). She was working three hours a day, four days a week (Tr. at 24). Plaintiff has never worked full time (Tr. at 26).

Plaintiff was living with her boy friend who was unemployed at the time (Tr. at 23). Plaintiff's son was taken from her by the state of Missouri because "his father had two previous TPRs."[5] (Tr. at 24). Plaintiff's daughter is being raised by plaintiff's father because plaintiff did not have enough money to take care of her (Tr. at 24).

Plaintiff has been homeless before (Tr. at 24-25). She was in special education classes in school (Tr. at 25). She tried to get her GED after she dropped out of high school, but "between working for or between school and court is was just too much for, too much stress and anxiety on me." (Tr. at 25).

---

[5]I have been unable to determine what "TPR" means.

About two years ago, plaintiff's depression got out of hand and she started going to Truman Behavioral (Tr. at 25). When she was trying to work, she would get distracted if anyone spoke to her (Tr. at 26). She did better working by herself (Tr. at 26). At Truman Behavioral, they tried to get her to sort and hang clothes at a thrift store, but she was pretty slow because she was distracted working around other people (Tr. at 27). At Truman Behavioral, they plan to get plaintiff a job coach to help her with "one or two problems like keep[ing] a part time job because they do not feel that I need to -- they don't feel that I need to work a full time job." (Tr. at 28).

Plaintiff does not believe she can work full time because she would "probably" have problems concentrating and being around large groups of people, she would "probably get too anxious" and "probably get very stressed." (Tr. at 28). Plaintiff is able to take care of her apartment, make sure she has food, and keep her residence clean (Tr. at 28). She did not need anyone to teach her how to do this (Tr. at 28).

Plaintiff's medications consisted of Remeron and Vistaril (Tr. at 23).

**2.  Vocational expert testimony.**

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge.

28

The first hypothetical involved a person capable of light work; could not do arithmetic, measuring or counting; could only have occasional contact with coworkers; could only do simple, repetitive, unskilled work; and could only do low-stress work, i.e., no production quotas and no sales work (Tr. at 30). The vocational expert testified that such a person could be a collator operator, D.O.T. 208.685-010, with 395 in the Kansas City area, 1,100 in Missouri, and 36,000 in the nation (Tr. at 30). The person could work as a folding machine operator, D.O.T. 208.685-014, with 700 in Kansas City, 1,700 in Missouri, and 46,000 in the country (Tr. at 30). The person could be an inserting machine operator, D.O.T. 208.685-018, with 600 in Kansas City, 1,000 in Missouri, and 43,000 in the nation (Tr. at 30).

The vocational expert's testimony is consistent with the Dictionary of Occupational Titles (Tr. at 30).

The job that plaintiff is training for is a medium exertional level job with an SVP of 2 (Tr. at 31). A cafeteria worker is a light, unskilled job with an SVP of 2 (Tr. at 31).

The second hypothetical was the same as the first except the person could not work within hearing distance of other individuals, had a 75% of normal production standard, and would

need a job coach on site (Tr. at 32). The vocational expert testified that such a person could not work (Tr. at 32).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge George Bock entered his opinion on September 5, 2008 (Tr. at 11-16).

Step one.  Plaintiff has not engaged in substantial gainful activity at any time of her life (Tr. at 11).  "[W]hen claimant filed for disability, she reported she stopped working on December 31, 2005 because she wasn't given enough hours, not because she was unable to do the work, which is inconsistent with an allegation of disability." (Tr. at 11).

Step two.  Plaintiff suffers from the following impairments which, when considered in combination, are severe:  reported history of cerebral palsy resulting in mild residual arm weakness, anxiety disorder not otherwise specified, major depressive disorder in partial remission with medication, personality disorder with compulsive features, learning disorder not otherwise specified with arithmetic and writing deficits, and possible attention deficit disorder untreated (Tr. at 12).

Step three.  Plaintiff's impairments do not meet or equal any listed impairment (Tr. at 12).

Step four.  Plaintiff's subjective allegations are not credible (Tr. at 13).  She retains the residual functional

30

capacity to perform light work; simple, repetitive, unskilled tasks that do not require arithmetic; and she can occasionally interact with co-workers in a low-stress environment (Tr. at 14). Since plaintiff has no past relevant work, step four is inapplicable.

Step five. Plaintiff can perform the jobs of collator operator, inserting machine operator, or folding machine operation, all available in significant numbers in the national and regional economies (Tr. at 15).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.

31

<u>Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve

32

pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> Claimant's allegations, including subjective complaints of pain, are not credible as to a finding of disability in light of the reports of treating and examining physicians, her current participation in vocational rehabilitation, her daily activities and ability to use public transportation, and her need for only mild medication to control her symptoms. Claimant is generally physically healthy and does not have physical limitations resulting from her history of cerebral palsy. However, giving her the benefit of the doubt, she is limited to light work only. Finally, the undersigned notes that at the hearing, claimant presented as articulate and clearly answered all questions without apparent difficulty.

(Tr. at 14).

## 1.  *PRIOR WORK RECORD*

Plaintiff has no prior work record. The evidence establishes that plaintiff quit any previous jobs for reasons unrelated to her impairments. This shows a low motivation to work and supports the ALJ's finding. The fact that a claimant left a job for reasons other than his or her medical condition is a proper consideration in assessing credibility. Medhaug v. Astrue, 578 F.3d 805, 816-817 (8th Cir. 2009).

33

## 2.   *DAILY ACTIVITIES*

Plaintiff has no difficulty with any daily activities.  She was able to walk three miles to and from appointments; the records summarized above establish that she has no difficulty with caring for herself and her home; she can go shopping, hang out with friends, visit the library, use a computer, sweep and mop staircases, do laundry, iron, mow, etc.  There is almost no evidence of any physical functional limitations, and what little evidence there is in this record is not consistent (i.e., there were only sporadic findings of any physical limitations at all).

## 3.   *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

The evidence clearly establishes that plaintiff's symptoms are controlled with medication.  She stated on multiple occasions that she experiences the symptoms when she is not taking medication and that her medication controls those symptoms.  Her treating sources have made findings consistent with those statements.  Additionally, the ALJ observed at the hearing that plaintiff was articulate and clearly answered all questions without apparently difficulty.  An ALJ's observations of a claimant's demeanor during a hearing may be properly relied on by the ALJ in making credibility determinations.  Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993); Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  Plaintiff has never been treated

34

for attention deficit disorder even though this condition allegedly causes some of her limitations and one doctor noted that plaintiff's intellectual performance would likely improve if she were treated for ADHD.

**4. PRECIPITATING AND AGGRAVATING FACTORS**

The only precipitating factor in this record is plaintiff's failure to take medication.

**5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

Plaintiff repeatedly denied any side effects from her medication. Mild medication is sufficient to control plaintiff's symptoms which is inconsistent with her allegations of disability. If an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010); Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009).

**6. FUNCTIONAL RESTRICTIONS**

Plaintiff is not under any functional restrictions. No one has ever given an opinion that plaintiff is disabled. Dr. McCarthy found that plaintiff had no physical limitations. Despite that, the ALJ gave plaintiff the benefit of the doubt in limiting her to light work.

35

## B. CREDIBILITY CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disabling symptoms are not credible. There is almost no evidence of any physical limitations, and the substantial evidence in the record establishes that plaintiff's mental impairment is adequately controlled by medication.

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity.

The record in this case contains conflicting opinions from two psychologists regarding the severity and effect of plaintiff's mental impairments. Michael H. Schwartz, Ph.D., examined plaintiff on February 11, 2006, for the state agency (Tr. at 223-26). In June 2008, Douglas B. Vaughan, Ph.D., assessed plaintiff's mental/intellectual functioning at the request of the state agency (Tr. at 250-55, 256-58). Contrary to plaintiff's contentions, the ALJ properly discounted the opinion of Dr. Schwartz and gave significant weight to that of Dr. Vaughan (Tr. at 14). The ALJ explained that he assigned enhanced weight to Dr. Vaughan's opinion because it was based on his review of the medical records as well as a thorough evaluation and testing of plaintiff (Tr. 14).

36

When there is a conflict between medical opinions regarding the severity of a claimant's impairment(s) and the effect of those impairments upon his or her capacity for work, it is the role of the ALJ to resolve those conflicts. Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) (citing Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir. 1989)). In this case, both psychologists were examining rather than treating sources, as well as specialists in the field of mental health. See 20 C.F.R. § 416.927(d)(1), (5). Consequently, the ALJ had to consider the factors of consistency and supporting evidence in order to determine the appropriate weight to assign these opinions. See 20 C.F.R. §§ 416.927(d)(3) and (4); Clevenger v. Social Security Administration, 567 F.3d 971, 975 (8th Cir. 2009) ("While none of the doctors was asked to estimate functional limitations during 2002, the inconsistency between the 2005 questionnaire's description of symptoms and the records of the treating physicians in 2002 gave the ALJ a sufficient basis to discredit the description of symptoms and the corresponding limitations set forth in Dr. Carter's later opinion.").

Dr. Vaughan's opinion is both well-supported and more consistent with the record as a whole than that of Dr. Schwartz. Dr. Schwartz examined plaintiff in February 2006, shortly after she filed her application for disability benefits (Tr. at 223-

26).  Although plaintiff gave a history of treatment, consisting

of Ritalin and Celexa, she was not then receiving treatment for

her mental impairments, which she reported as mild cerebral palsy

and mild mental retardation (Tr. at 223).  Indeed, when plaintiff

was first seen at Truman Medical Center Behavior Health in

October 2007, it was noted that she had been off all medications

for the past four years (Tr. at 317).  She told Dr. Schwartz that

the main reason why she could not work was her difficulty with

concentration (Tr. at 224).  His diagnostic impression was

attention deficit hyperactivity disorder, provisional; borderline

mental retardation, by history; and cerebral palsy, by history

(Tr. at 224).  According to Dr. Schwartz, plaintiff could

remember work location and procedures and understand and follow

simple directions, but he also believed it would be difficult

for her to maintain such behaviors on the job over time (Tr. at

224).

Correspondence within the Office of the Regional Medical

Consultant reveals concern that Dr. Schwartz's opinion was not

well-supported.  In February 2006 when Dr. Schwartz evaluated

plaintiff, there was no other objective medical evidence in the

record.  In March 2008, Richard C. Kaspar, Ph.D., a clinical

psychologist in the Office of the Regional Medical Consultant,

reviewed the file as then constituted and recommended further

38

development, to include testing -- Wechsler Adult Intelligence Scale-III (WAIS-III), Wechsler Memory Scale-III (WMS-III), Woodcock Johnson or Wide Range Achievement, and Connor's -- to evaluate plaintiff's learning disability/achievement and to assess her ADD/ADHD, before the hearing date was established (Tr. at 249).

When plaintiff met with Dr. Vaughan in June 2008 on two separate sessions, she told him that she had been in treatment at Truman Medical Center Behavioral Health for the past two years or so (Tr. at 251). According to plaintiff, her medications gave her good control of her symptoms of depression and anxiety (Tr. at 251-52). Dr. Vaughan's report reflects that plaintiff had a history of abandonment by her mother and then her father, and eventually spent about four years in the foster care system (Tr. at 251). This cycle repeated when plaintiff lost both of her children, a son to adoption, and a daughter to plaintiff's father who had custody and allowed her to visit only once a year (Tr. at 251-52). While she denied any individual or group therapy, she did report to Dr. Vaughan that she received occupational therapy at Truman Medical Center Behavioral Health to help her deal with her emotions, not become angry and irritable, and also to teach her job skills (Tr. at 251).

Case 4:10-cv-00566-REL   Document 15   Filed 11/02/11   Page 39 of 44

On the WAIS-III, plaintiff had a verbal IQ of 77, a performance IQ of 74, and a full-scale IQ of 74 (Tr. at 253). Dr. Vaughan noted that these scores placed her within the borderline range of intellectual functioning (Tr. at 253).  At the same time, he noted the presence of other evidence that suggested somewhat higher functioning (Tr. at 253).  The majority of plaintiff's memory scores were in the average and low average ranges; however, Dr. Vaughan noted that her working memory score was "extremely low" (Tr. at 254).  This suggested "significant difficulties with attending to information, holding and processing that information in memory, and [formulating] a response on that information" (Tr. at 254).  He also noted the effect on plaintiff's test performance of her increasingly negative attitude to testing, as well as her need to leave early enough to walk to the nearest bus stop (Tr. at 254).  Finally, he speculated that if plaintiff had been on medication for her ADD/ADHD, she may have performed at a higher level (Tr. at 254).

The major discrepancy between the conflicting psychologist assessments lies in Dr. Schwartz's belief that while plaintiff could demonstrate certain job-related capabilities over the short term, she might have difficulty maintaining those behaviors on the job over time (Tr. at 12, 224).  This is inconsistent with plaintiff's history of work and the nondisability-related reason

40

she left her last job at Wendy's after working there for about a year (Tr. at 23).

Dr. Vaughan did not agree that plaintiff was as limited as Dr. Schwartz found. He stated his belief that plaintiff "appeared capable of understanding and remembering simple and possibly some repetitive detailed instructions, could attend and concentrate for simple tasks, could interact with the public, supervisors, and co-workers in a low stress setting, and seemed able to adapt to routine work changes in a low stress setting (Tr. at 13, 255). The remainder of Dr. Schwartz's assessment -- that plaintiff could remember work location and procedures and understand and follow simple directions -- was generally consistent with that of Dr. Vaughan (Tr. at 12, 224). The ALJ's finding that Dr. Vaughan's opinion was entitled to greater weight is supported by the record as a whole.

Plaintiff challenges the ALJ's failure to discuss a two-page family court vocational report dated January 2004 (Tr. at 141-42). However, this evidence, which originated two years before she filed her application for disability, was not within the relevant period (the findings discussed were from when plaintiff was from 10 to 14 years old), and the ALJ had no obligation to consider it. See 20 C.F.R. § 416.912(c).

41

Although the objective medical evidence showed no severe physical impairment, the ALJ restricted plaintiff to working at the light level of exertion, in deference to her alleged history of cerebral palsy. Additionally, the results of the psychometric testing conducted by Dr. Vaughan justifies a limitation to simple, repetitive, unskilled work that does not require the use of arithmetic. The ALJ also gave some credence to the evidence suggesting the presence of ADD/ADHD by limiting plaintiff to work that involves only occasional interaction with co-workers in a low-stress environment. This is despite the evidence that plaintiff was able to participate in group therapy and interact with others appropriately in that setting. The evidence seems to suggest that plaintiff works well with others so long as she likes what she is doing. This is consistent with her mother's report that she is fine as long as she gets her own way.

Based on all of the above, I find that the ALJ properly formulated plaintiff's residual functional capacity after considering the record as a whole.

### VIII. VOCATIONAL EXPERT TESTIMONY

Finally, plaintiff argues that the ALJ erred in relying on a hypothetical which did not account for all of plaintiff's limitations.

A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments. Buckner v. Astrue, 646 F.3d 549, 560-561 (8th Cir. 2011); Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010). But when a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole. Buckner v. Astrue, 646 F.3d at 561; Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). However, the hypothetical need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead "should capture the concrete consequences of those impairments." Hulsey v. Astrue, 622 F.3d at 922 (quotation and citation omitted).

> [W]e have held that "an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when '[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities'" or "when the record does not support the claimant's contention that his impairments 'significantly restricted his ability to perform gainful employment.'" Owen v. Astrue, 551 F.3d 792, 801–802 (8th Cir. 2008) (quoting Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994); Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table opinion)).

Buckner v. Astrue, 646 F.3d at 561.

43

In this case the ALJ relied on a hypothetical that encompassed all of plaintiff's credible impairments.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 2, 2011